**SO ORDERED**

**SIGNED this 16 day of May, 2025.**

_____
**Pamela W. McAfee**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

|  |  |
|---|---|
| **IN RE:** | |
| | **Case No.** |
| **Williams Land Clearing, Grading, and** | **22-02094-5-PWM** |
| **Timber Logger, LLC,** | **Chapter 11** |
| | |
| **Debtor.** | |

|  |  |
|---|---|
| **Williams Land Clearing, Grading, and** | **Adversary Proceeding** |
| **Timber Logger, LLC,** | **No. 23-00024-5-PWM** |
|     **Plaintiff,** | |
| | |
|     **v.** | |
| | |
| **Apex Funding Source LLC and Yehuda** | |
| **Klein a/k/a Jay Klein,** | |
|     **Defendants.** | |

**Commercial Funding, Inc.,**
    **Intervenor Plaintiff,**

    **v.**

**Williams Land Clearing, Grading, and**
**Timber Logger, LLC, Apex Funding Source LLC,**
**and Yehuda Klein a/k/a Jay Klein,**
    **Intervenor Defendants.**

## ORDER ALLOWING IN PART AND DENYING IN PART
## MOTIONS FOR SUMMARY JUDGMENT

The matters before the court are the motions for partial summary judgment filed by the Intervenor Plaintiff, Commercial Funding, Inc. (CFI), D.E. 91, and the motions for summary judgment filed by the Defendants and Intervenor Defendants, Apex Funding Source LLC (Apex) and Yehuda Klein a/k/a Jay Klein, D.E. 99 and 95, respectively. The motions were fully briefed and a hearing was conducted in Raleigh, North Carolina on March 18, 2025. At the hearing, the court indicated that summary judgment would be granted in favor of Mr. Klein on all claims asserted against him in the Amended Complaint and the Intervenor Complaint, that summary judgment would be granted in favor of Apex on the tortious interference with contract claim asserted in the Intervenor Complaint, and that the remaining claims would be taken under advisement.

After full consideration, and for the reasons set forth below, the court holds as follows:

Mr. Klein's motions for summary judgment on all claims in the Amended Complaint and the Intervenor Complaint are ALLOWED;

Apex's motion for summary judgment on Williams Land's claim to avoid fraudulent transfers pursuant to 11 U.S.C. § 548 is ALLOWED;

Apex's motion for summary judgment on Williams Land's objection to its claim is DENIED;

Apex's motion for summary judgment on Williams Land's claim for unfair and deceptive trade practices pursuant to chapter 75 of the North Carolina General Statutes is DENIED IN PART and ALLOWED IN PART;

Apex's motion for summary judgment on Williams Land's claim to avoid preferential payments pursuant to 11 U.S.C. § 547 is DENIED and summary judgment will be entered in favor of Williams Land on this claim;

Apex's motion for summary judgment on Williams Land's claim to recover avoided transfers pursuant to 11 U.S.C. § 550 is DENIED and summary judgment will be entered in favor of Williams Land on this claim;

Apex's motion for summary judgment on Williams Land's claim for equitable subordination is DENIED;

2

CFI's motion for summary judgment seeking a declaratory judgment that any transfers should be avoided for its benefit and not the benefit of the estate is DENIED, and summary judgment will be entered in favor of Williams Land on this claim;

CFI's motion for summary judgment on its claim for conversion against Apex is DENIED, and Apex's motion for summary judgment on CFI's claim for conversion against it is ALLOWED; and

Apex's motion for summary judgment on CFI's claim for tortious interference with contract is ALLOWED.

## PROCEDURAL HISTORY

Williams Land Clearing, Grading, and Timber Logger, LLC (Williams Land) filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on September 16, 2022. Its liquidating chapter 11 plan was confirmed on October 30, 2023. Williams Land filed the complaint in this adversary proceeding on April 26, 2023, asserting the following claims against Apex and Mr. Klein: Avoidance of Fraudulent Transfers of Receivables pursuant to 11 U.S.C. § 548 (both Defendants); Objection to Claim (Apex); Unfair and Deceptive Trade Practices pursuant to chapter 75 of the North Carolina General Statutes (Apex); in the alternative, Avoidance of Preference Payments pursuant to 11 U.S.C. § 547 (both Defendants); and, Recovery of Avoided Transfers pursuant to 11 U.S.C. § 550 (both Defendants). Apex and Mr. Klein filed a motion to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, made applicable in this adversary proceeding by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, on June 26, 2023, D.E. 9. On July 21, 2023, Williams Land filed an Amended Complaint, D.E. 14, asserting the same claims as the original complaint and adding a claim for equitable subordination. Apex and Mr. Klein filed a motion to dismiss the Amended Complaint on August 28, 2023, D.E. 24.

The court conducted a hearing on the motion to dismiss the Amended Complaint on December 14, 2023, and denied the motion by written order on February 8, 2024, D.E. 62. Apex and Mr. Klein filed an interlocutory appeal and motion for leave to appeal that order, which was denied by the United States District Court for the Eastern District of North Carolina on August 5, 2024, D.E. 87.

In the interim, on July 7, 2023, CFI filed its Motion to Intervene, D.E. 11, asserting that as the senior secured creditor, it was entitled to payment of any funds recovered in the adversary proceeding, and also advancing claims against Apex and Mr. Klein for conversion of its collateral and tortious interference with contract. Williams Land filed a limited response, D.E. 15, not opposing the Motion to Intervene but reserving the right to oppose CFI's claim for direct payment of any proceeds of the litigation. Apex and Mr. Klein opposed the Motion to Intervene, D.E. 18. After a hearing conducted on September 19, 2023, the court directed CFI to supplement its Motion to Intervene with a proposed pleading, and invited Apex and Mr. Klein to submit a further response thereafter. D.E. 30. CFI supplemented its Motion to Intervene on September 27, 2023, D.E. 34, and Apex and Mr. Klein filed no further response. The court allowed the Motion to Intervene by order dated November 15, 2023, DE. 39.

CFI filed its Intervenor Complaint on November 28, 2023, D.E. 42, and Apex and Mr. Klein filed a motion to dismiss the Intervenor Complaint pursuant to Rules 12(b)(1) and 12(b)(6) on January 23, 2024, D.E. 60. The court denied the motion to dismiss the Intervenor Complaint on March 22, 2024, D.E. 73. In that order, the court found that it has constitutional authority to enter a final order and judgment on all the claims in the Amended Complaint and the Intervenor Complaint. *Id.* On April 4, 2024, the court issued an order directing the parties to proceed with

pretrial scheduling and discovery pending the district court's consideration of the motion for leave to appeal the order denying the motion to dismiss the Amended Complaint, D.E. 75.

On December 17, 2024, CFI filed its motion for partial summary judgment on its claim for declaratory judgment that any recovery by Williams Land on its avoidance action should be for the benefit of CFI, and not the estate as a whole, and on its claim for conversion against Apex and Mr. Klein. On December 20, 2024, Apex and Mr. Klein filed motions for summary judgment on all claims in the Amended Complaint and the Intervenor Complaint. After a number of extensions of time to respond were allowed, the motions were fully briefed as of February 7, 2025, and a hearing was conducted on March 18, 2025.

In the briefing, CFI conceded that it did not have evidentiary support for its intervenor claims for tortious interference with contract against either Apex or Mr. Klein. At the hearing, CFI conceded that it also did not have evidentiary support for its claim for conversion against Mr. Klein. CFI further clarified at the hearing that its claim for declaratory judgment is not based on a right to litigation proceeds recovered by Williams Land on its chapter 5 claims against Apex due to CFI's security interest in those proceeds (as it had briefed), but instead that this claim is based entirely on CFI's conversion claim against Apex.[1] Also at the hearing, Williams Land conceded that it had no evidentiary support for any of its claims against Mr. Klein.

## JURISDICTION

This bankruptcy court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334. This is a statutorily core proceeding under 28 U.S.C.

---

[1] This claim and argument are addressed more fully below. However, CFI did suggest at the hearing that because its claim to the litigation proceeds is entirely due to its independent claim against Apex, then Apex could be subject to double payment – once to the debtor for its chapter 5 claims, and once to CFI for its conversion claim. It seems to the court, then, that CFI is not asserting any right to the debtor's litigation recovery, but instead simply contends that it has a separate claim against Apex for the same sums.

§ 157(b)(1) that this court is authorized to hear and determine. The United States District Court for the Eastern District of North Carolina has referred this case and this proceeding to this court under 28 U.S.C. § 157(a) by its General Order of Reference entered on August 3, 1984. This proceeding is constitutionally core, and this court may enter final orders herein.[2] Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment "is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating a summary judgment motion, a court "must consider whether a reasonable jury could find favor in the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant." *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate the existence of specific, material facts that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Id.* at 248.

---

[2] Apex challenged this court's jurisdiction in its motions to dismiss the Amended Complaint and the Intervenor Complaint, but it did not reassert those challenges in its motions for summary judgment.

Because CFI, Apex, and Mr. Klein have each filed motions for summary judgment, the burden to come forward to show there is a genuine issue of material fact varies with each motion. Fed. R. Civ. P. 56(c)(1).

## UNDISPUTED FACTS

On July 12, 2021, Williams Land entered into an agreement with CFI pursuant to which CFI purchased certain of Williams Land's future accounts receivable, and Williams Land granted CFI a security interest in all of its assets, including its accounts receivable.[3] *See* Claim No. 69-1 and exhibits thereto. On June 22, 2021, CFI filed a UCC-1 financing statement with the North Carolina Secretary of State, thereby perfecting CFI's security interest in Williams Land's assets including its accounts receivable. *Id.* at Ex. 5. CFI filed a proof of claim in the amount of $770,976.84, asserting that its claim is fully secured. Claim No. 69-1.

On March 8, 2022, Williams Land entered into a Standard Merchant Cash Advance Agreement (MCA Agreement) with Apex, pursuant to which Apex purported to purchase $337,500 of Williams Land's future receivables for a cash payment to Williams Land in the amount of $250,000.[4] *See* Summ. J. Ex. 1, D.E. 97-1 at 1. On the same day, Apex filed a UCC-1 financing statement with the North Carolina Secretary of State, perfecting its asserted security interest in all of Williams Land's assets, including accounts receivable. Summ. J. Ex. 2, D.E. 97-1 at 1 at 21. As between CFI and Apex, CFI holds the first priority security interest in Williams Land's receivables. Neither Apex nor its attorney, Mr. Klein, conducted a UCC search to determine whether there were any senior liens against Williams Land's receivables, but Apex instead relied upon the

---

[3] There has been no challenge to the asserted nature of the CFI transaction as a true sale or traditional factor.

[4] Although there is no disputed fact as to the terms and language of the MCA Agreement, there is significant dispute as to the legal interpretation of that agreement. Accordingly, any relevant language of the MCA Agreement is set forth in the discussion below.

representation of Williams Land contained within the MCA Agreement that no prior lien existed. Accordingly, Apex asserts, and CFI does not dispute, that Apex did not have actual knowledge of the CFI security interest.

Pursuant to the terms of the MCA Agreement, Williams Land made eight weekly payments to Apex in the amount of $18,750 through May 4, 2022. *See* D.E. 14, Ex. C. After Williams Land defaulted on its contractual payments, on May 10, 2022, Apex through its counsel Mr. Klein filed a lawsuit in the Supreme Court of the State of New York to collect $187,500 remaining due under the MCA Agreement, plus $75,000 in contractual costs and $2,500 in default account fees. On July 11, 2022, Williams Land and Apex signed a Stipulation of Settlement in which the parties agreed that Williams Land would pay Apex the sum of $165,000 through monthly payments of $19,285.71, with one payment of $30,000 to be paid by wire transfer or check "on behalf of" Williams Land. Summ. J. Ex. 5, D.E. 97-1 at 44. Williams Land defaulted on the terms of the Stipulation of Settlement, after which a judgment was entered in favor of Apex in the amount of $138,577.17. Summ. J. Ex. 7, D.E. 97-1 at 49. The request for entry of judgment acknowledges receipt of $30,159.42 pursuant to the Stipulation of Settlement. Summ. J. Ex. 6, D.E. 97-1 at 48.

Meanwhile, between June 9, 2022, and October 6, 2022, Williams Land became entitled to $133,878.38 in payments from its customer, Domtar Corporation. On May 9, 2022, Mr. Klein, as attorney for Apex, sent a letter to Domtar asserting Apex's lien in the Domtar accounts payable and demanding that Domtar make payments directly to Apex. In response to this letter, Domtar paid Apex (through its attorney) the sums of $48,782.06 on June 9, 2022, and $30,159.42 on July 14, 2022, for a total of $78,941.48.[5] Although CFI asserts that it held the senior secured lien on the

---

[5] The July 14, 2022 payment was also made with the agreement of Williams Land pursuant to the Stipulation of Settlement. For purposes of this decision, it is not necessary to determine whether the payment was also in response to the UCC letter.

Domtar receivable, it does not contend that the Domtar receivable was one that it had purchased under its agreement with Williams Land. CFI also concedes that it had not taken steps to enforce its lien on the Domtar receivable.

In total, Apex received the sum of $228,941.48 from either Williams Land or its customers pursuant to the MCA Agreement. Apex filed a proof of claim asserting a fully secured balance due in the amount of $120,652.07. Claim No. 64-1. The attachments supporting the proof of claim include the MCA Agreement, the guarantee of performance executed by Williams Land's principal, and the UCC Financing Statement, but not the judgment or other documents related to the collection action. *See id.*

## CONTENTIONS

Based on these facts, Williams Land contends that the MCA Agreement is not a true sale, but instead is a usurious loan that is void under New York law. If the agreement is void, Williams Land contends that as a matter of law it received no reasonably equivalent value for the payments made to Apex, rendering those payments avoidable under § 548 of the Bankruptcy Code. Williams Land further contends that the $30,159.42 payment Apex received from Domtar is an avoidable preference under § 547 of the Bankruptcy Code. Williams Land's claim for unfair and deceptive trade practices is also grounded in part on its claim that the MCA Agreement is, in reality, a usurious loan. Apex, on the other hand, contends that the MCA Agreement is a true sale and that all of Williams Land's claims fail as a matter of law because they are dependent upon the recharacterization of the agreement as a loan.

Also relying on the undisputed facts, CFI contends Apex converted its collateral by directing Domtar to pay to Apex monies owed to Williams Land in contravention of CFI's senior lien on receivables. Apex, on the other hand, contends that the undisputed facts defeat any claim

for conversion; specifically, that it did not know that CFI asserted a security interest in the Domtar receivable and that CFI made no demand for the return of its collateral.

## DISCUSSION

### APEX'S MOTION FOR SUMMARY JUDGMENT ON WILLIAMS LAND'S CLAIMS

As noted above, Williams Land's Amended Complaint asserts claims that require a preliminary determination of whether the MCA Agreement is a sale or loan under New York law, which applies by virtue of a choice of law provision within the agreement.[6] According to Williams Land, if the MCA Agreement is a loan, it is criminally usurious under New York law and, by operation of statute, void. Williams Land's claims for avoidable transfers and unfair and deceptive trade practices and its objection to Apex's claim are dependent on and arise from an ultimate conclusion that the MCA Agreement is void.

Apex, on the other hand, contends that usury laws are inapplicable because the MCA Agreement is a true sale and not a loan. *See LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 122 N.Y.S.3d 309, 312 (N.Y. App. Div. 2020) ("The rudimentary element of usury is the existence of a loan or forbearance of money, and where there is no loan, there can be no usury, however unconscionable the contract may be."). For the same reason, Apex maintains that the payments received from Domtar are not avoidable preferences or constructively fraudulent transfers as a matter of law because Williams Land had no interest in the property transferred by Domtar – the account was already owned by Apex. Apex also contends that even if the court construes the agreement to be a loan, New York's criminal usury statutes may not be used

---

[6] In its motion to dismiss the Amended Complaint, Apex contended that if the agreement is construed as a loan, the choice of law provision in the MCA Agreement should be disregarded, maintaining that North Carolina requires application of North Carolina interest law to any North Carolina borrower. *See* D.E. 10. The court disagreed, D.E. 62, and Apex sought leave to appeal the court's interlocutory order denying Apex's motion to dismiss, D.E. 69, which the district court denied. D.E. 87. Apex has not reasserted the choice of law argument on summary judgment.

10

affirmatively by a plaintiff to void an agreement, but may only be used defensively where a lender seeks to collect on the loan.

Accordingly, the threshold issues for the court before considering the delineated claims are whether the MCA Agreement is a loan or a sale, and, if it is a loan, whether and how the New York usury laws apply.

**The Nature of the MCA Agreement**

While the determination of whether an agreement is a sale or is a loan is typically a factually-intensive one, *see Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797, 820 (Bankr. D. Mont. 2021), the parties here provided no forecast of evidence as to the course of dealing between the parties other than the MCA Agreement itself and the payment history. Thus, the court must construe the agreement based solely on its language to determine whether it constitutes a loan or a sale under New York law.

The MCA Agreement does contain language designed to reflect the intent of the parties for the transaction to be a sale of receivables. For example, the summary of the transaction lists a "purchase price" and "receivables purchased amount." *See* Summ. J. Ex. 1, D.E. 97-1 at 1. Paragraph 1 of the Terms and Conditions is entitled "Sale of Future Receipts" and provides that Williams Land sells, assigns, and transfers to Apex "all of [Williams Land]'s future accounts . . . from contract rights, and other obligations arising from or relating to the payment of monies" from Williams Land's customers for payment for Williams Land's services. *Id.* Paragraph 15 of the Terms and Conditions provides that the purchase price is "in exchange for the Receivables Purchased Amount" and "is not intended to be, nor shall it be construed as a loan[.]" *Id.* at 4.

Under New York law, however, the question of whether an agreement constitutes a loan is governed by its substance, not its form. *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, No.

11

22-1885-CV, 2023 WL 3882697, at *2 (2d Cir. June 8, 2023); *see also Adar Bays, LLC v. GeneSYS ID, Inc.*, 179 N.E.3d 612, 621–22 (N.Y. 2021). Courts generally evaluate three factors to determine whether a transaction is a loan under New York law: (1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy. *LG Funding, LLC*, 122 N.Y.S.3d at 312. These considerations take into account the totality of the circumstances, and "a court need not find the presence of all three factors in concluding that a transaction is a loan." *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20-CV-5120 (LJL), 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022).

Other courts consider additional factors that inform the analysis of the primary three factors. For example, the bankruptcy court in *Shoot the Moon* identified these considerations:

(1)    whether the buyer has a right of recourse against the seller;
(2)    whether the seller continues to service the accounts and commingles receipts with its operating funds;
(3)    whether there was an independent investigation by the buyer of the account debtor;
(4)    whether the seller has a right to excess collections;
(5)    whether the seller retains an option to repurchase accounts;
(6)    whether the buyer can unilaterally alter the pricing terms;
(7)    whether the seller has the absolute power to alter or compromise the terms of the underlying asset; and
(8)    the language of the agreement and the conduct of the parties.

635 B.R. at 813. While the *Shoot the Moon* court was applying Montana law, the evaluative factors appear to overlap.

At its core, the analysis looks to which party bears the risk of non-payment on the accounts that the "buyer" purports to purchase. *See id.* at 819. ("[A] consideration that overlays and unites the factors is how the parties allocated *risk*."). Professor Kara Bruce of the University of North

Carolina School of Law has written extensively on the risk allocation issue, and, in collecting recent cases, has the following observations:

> When weighing whether a transaction styled as a sale is a true sale, the core of the inquiry is to assess which party—buyer or seller—holds the risks, benefits, obligations, and other attributes we typically associate with ownership. When an item of property is sold, the buyer takes on the upside and downside risk of that item's future performance. With a secured loan, in contrast, the lender's entitlement to payment is not dependent on the performance or value of the underlying collateral. Further, in a typical sale transaction, the buyer controls the asset and must take on the obligations associated with ownership, such as servicing accounts.
>
> ***
>
> It is thus important to approach a true-sale analysis by remembering that "the substance of MCA transactions may belie the contracts' careful descriptions of risk allocation." Courts must look beyond the contract's window-dressing to evaluate the true commercial nature of these transactions. The ultimate question, again, is whether the buyer has acquired the risks and rewards of the purchased receivables (in line with a true sale) or has instead contracted for a repayment that does not vary based on the performance of the assets (in line with a secured loan).

Kara J. Bruce, Revenue-Based Finance in Bankruptcy and Beyond, 45 No. 4 Bankruptcy Law Letter NL 1 at 6 (April 2025) (citations omitted). The court finds her discussion to be persuasive, and with these concepts in mind, has considered the three factors as supplemented by the considerations identified in *Shoot the Moon* to evaluate the allocation of risk. Because the court finds the "recourse in bankruptcy" factor to be the best indicator that the risk of nonpayment is not truly shifted to Apex through the MCA Agreement, the bulk of the following discussion is devoted to that factor.

<u>Factors I and II: Reconciliation and Finite Term</u>

While there is a reconciliation provision in the MCA Agreement, Summ. J. Ex. 1, D.E. 97-1 at 2, ¶ 4, there are no facts before the court to establish whether there is a true opportunity to adjust payments. Further, invocation of the reconciliation provision does not change the amount ultimately owed, but only the amount of the payment to be made in a particular week. Similarly,

13

while there is no stated "finite" term, the term is easily calculated based on simple math – weekly payments of $18,750 until the amount of $337,500 is received, *see id.* at 1, which results in a term of 18 weeks. Absent invocation of the reconciliation provision, the term is readily discernable. *See, e.g., AKF, Inc. v. Haven Transp. Bus. Sols., Inc.*, No. 1:22-cv-269 (MAD/CFH), 2024 WL 2941746, at *7 (N.D.N.Y. June 11, 2024) and cases cited therein. Without additional context including course of dealing, however, the court finds that neither of these factors is dispositive of the characterization as either a sale or a loan.

<u>Factor III: Recourse in Bankruptcy</u>

Many courts find "recourse in bankruptcy" where the agreement provides that default remedies are triggered by the merchant's bankruptcy, thereby accelerating any unpaid purchased amount. *See, e.g., Fleetwood Servs.*, 2022 WL 1997207, at *9; *LG Funding, LLC*, 122 N.Y.S.3d at 313 . Apex denies that it has recourse in Williams Land's bankruptcy because bankruptcy is not a delineated event of default within the MCA Agreement. It is true that bankruptcy itself does not trigger a default under the Apex MCA Agreement, but that does not end the inquiry, because a number of other defaults occur by necessity when a bankruptcy is filed (for example, changing the depository account into which receivables are paid by the opening of a DIP account), which, by the terms of the MCA Agreement, do result in acceleration of all amounts due. Summ. J. Ex. 1, D.E. 97-1 at 4-5, ¶ 17.

More importantly, in this court's view, the often-used "bankruptcy as an event of default" analysis conflates the question of whether Apex's remedies are triggered by a bankruptcy filing with the question of whether Apex has the ability to collect – *i.e.*, *recourse* – notwithstanding Williams Land's bankruptcy. To phrase it differently, the question is whether Apex has a means to recover payment if Williams Land stops operating and no longer generates the future receivables

that Apex purports to have purchased. If Apex truly bore the risk and had no recourse in bankruptcy, it would have no ability to recover once the payment stream to Williams Land stopped.

Here, Apex's own actions suggest that it believes it has recourse against both Williams Land and its guarantor: Apex filed a secured proof of claim in the Williams Land chapter 11 case for the full amount it contends is due, including fees and costs, Claim No. 64-1. Courts consider the filing of a proof of claim to be relevant to this factor. *See, e.g., JCS Hospitality LLC v. LG Funding LLC (In re JCS Hospitality)*, Adv. Pro. No. 24-00034-5-PWM (Bankr. E.D.N.C. Sept. 16, 2004) (Slip Op., D.E. 18 at 8) (finding that the filing of a secured proof of claim indicates that an MCA lender believes it has recourse to recover defaulted amounts in the bankruptcy case); *AKF,* 2024 WL 2941746, at *7 ("Despite the[] assertions in the Agreement of being left without recourse in the event of a bankruptcy, it seems virtually certain that FundKite would be able to file a claim in any bankruptcy proceeding, as a secured creditor, for any remainder of the [amount] owed."). Through its proof of claim, Apex asserts that it has a blanket lien on assets (which is a separate question from whether the lien is supported by collateral), and that it has a claim for the total balance due (which is a separate question from whether there will be a distribution on the claim). As evidence of additional means of collection, Apex also pursued recovery against the principal's guaranty through its collection litigation. *See* Summ. J. Exs. 3-7, D.E. 97-1 at 21-51.

The blanket lien on assets, the filed proof of claim, and the guaranty allow Apex, in some way, to collect on its debt from Williams Land even if the debtor stops generating receivables. Those remedies are evidence of recourse in the event of bankruptcy. With no recourse, there would be no source of payment once purchased future accounts were no longer being generated. Instead, Apex has multiple alternate methods to recover on its claim even where there are no new receivables, making it readily apparent to the court that Apex has burdened itself with very little

risk through the MCA Agreement, if Apex has taken on any risk at all. Because the risk of nonpayment by a customer is not shifted to Apex, the court concludes as a matter of law that the MCA Agreement is a loan, and not a true sale.

<u>Other Provisions Informing the Analysis</u>

While the court finds that Apex's recourse in bankruptcy is sufficient to conclude that the risk of loss remains with Williams Land under the MCA Agreement and that the agreement is a loan, the MCA Agreement also contains additional indicia (as identified in *Shoot the Moon*) that the risk of loss remains with Williams Land. Specifically, Apex's lien extends beyond the assets that it purported to purchase to also include all accounts and inventory and all proceeds; Apex obtained (and pursued) a personal guaranty of Williams Land's principal; and the default provisions, found at Summ. J. Ex. 1, D.E. 97-1 at 4-5, ¶ 17, include "aggressive loan-like remedies that [spring] into effect if the merchant default[s]," *Haymount Urgent Care PC v. GoFund Advance, LLC,* 609 F. Supp. 3d 237, 249 (S.D.N.Y. 2022), such as acceleration of amounts due, an assignment of lease, power of attorney, and additional costs of collection and attorney's fees. In addition, there is no evidence that Apex took over servicing the accounts or that Williams Land segregated the funds, and there is no evidence that Apex investigated the customers to determine the collectability of the purchased accounts.

Indeed, to the last point, Apex did not purport to purchase specific accounts. Instead, its agreement purports to purchase "all" accounts "until the amount [of $337,500] has been delivered" by Williams Land to Apex, with 13% of all receivables to be delivered weekly until the amount is paid in full. In this way, Apex is purchasing whichever accounts pay first – again, taking only the minor risk that *none* of Williams Land's customers will pay, rather than taking the risk that specific accounts will not be paid. This is consistent with a scenario described by Professor Bruce:

16

The funder takes an interest in an unspecified share of receivables, which means, quite simply, the funder always gets the good ones. The funder draws its payment from whatever money the debtor has available, which include accounts that have been paid, funds from other MCA companies, and any other monies that happen to be in the debtor's deposit account. In this way, the MCA funder's recovery is in no way tied to the performance of any individual account. If 20% of the accounts go uncollected, or 50%, or 70%, the funder's ultimate recovery remains payable from the first dollars received by the merchant. A reconciliation of the MCA, if available, could adjust the *timeframe* for repayment, but would not alter the principal amount owing.

Bruce, Revenue-Based, 45 No. 4 Bankruptcy Law Letter NL 1 at 7 (citations omitted). Based on this analysis, and considering the MCA Agreement as a whole, the court finds that Apex's many sources of recourse and other indicia of its lack of risk lead to only one conclusion: that the MCA Agreement is a loan, and not a sale, as a matter of law.

**The MCA Agreement is Void as Usurious under New York Law**

Having determined that the MCA Agreement is a loan and not a true sale, the court turns to whether New York's usury statutes apply and, if so, the consequences of those statutes. Under New York law, an interest rate of more than 25% per annum is usurious. Here, a calculation of the effective rate of interest based on the funds advanced and the contractual term of repayment of 18 weeks results in an annual simple interest rate of 101.1%. D.E. 14 at ¶ 46. Accordingly, the terms of the MCA Agreement bring it within the New York usury statutes.

New York law also specifies the consequences of usury. Pursuant to New York Penal Law § 190.40, "[a] person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period." N.Y. Penal Law § 190.40. Separately, New York's General Obligations Law § 5-511(1) provides for the voidability of those contracts. *Adar Bays,* 179 N.E.3d at 621. Construing both statutes, New York's highest

court has held that, where a loan is found to be criminally usurious, the proper remedy is to render the agreement void *ab initio*. *Id.* at 615-20 (providing a detailed discussion of the history of New York's criminal usury laws and the extension of those laws to voiding usurious contracts involving corporate borrowers).

Apex maintains that Williams Land may not bring an affirmative action for criminal usury, and as a general matter, this court agrees. Likewise, New York courts have held that the general prohibition on corporations asserting (noncriminal) usury as a defense should also be read to prohibit corporations from bringing affirmative claims alleging criminal usury. *Haymount Urgent Care PC v. GoFund Advance, LLC*, 635 F. Supp. 3d 238, 242–43 (S.D.N.Y. 2022) (citing *Intima-Eighteen, Inc. v. A.H. Schreiber Co.*, 568 N.Y.S.2d 802, 172 A.D. 2d 456, 457–58 (N.Y. App. Div. 1991)). However, a corporation may assert *criminal* usury as a defense, and use of that defense is broad; General Obligations Law § 5-521(3) provides that corporations may interpose the defense of criminal usury in "*any* action." *Haymount Urgent Care PC*, 635 F. Supp. 3d at 244 (emphasis in original).

"[A]ssertion of criminal usury, to the extent the Debtor utilizes such assertion as a defense to repayment of Defendant's claim, is procedurally proper under applicable New York law." *In re GMI Grp., Inc.*, 606 B.R. 467, 483 (Bankr. N.D. Ga. 2019). Here, Apex filed a proof of claim, and the Amended Complaint includes an objection to claim as part of the relief sought. It is this important difference that distinguishes this case from this court's decision in *Azalea Gyn., P.A. v. Mint Funding Inc. (In re Azalea Gyn., P.A.)*, Adv. Pro. No. 24-00107-5-PWM (Bankr. E.D.N.C. Dec. 6, 2024) (Slip Op., D.E. 10 at 8), in which the plaintiff/debtor could not assert usury laws as an affirmative claim against an MCA creditor that had filed no claim in the bankruptcy case.

Here, using an annual simple interest calculation, the rate of interest under the MCA Agreement is 101.1%, exceeding the 25% threshold prescribed in New York Penal Law § 190.40. Pursuant to applicable New York statutory and case law, the MCA Agreement is criminally usurious. By application of General Obligations Law § 5-511(1), it is also void *ab initio*. The effect of this finding, however, must be assessed with respect to the specific claims for relief in the Amended Complaint, to which the court now turns.[7]

**First Claim for Relief: Avoidance of Fraudulent Transfers under 11 U.S.C. § 548**

As relevant here, § 548 of the Bankruptcy Code provides for the avoidance of constructively fraudulent transfers of an interest of the debtor in property where the debtor received less than reasonably equivalent value in exchange for the transfer and the debtor was insolvent. Williams Land seeks to avoid all of the payments made to Apex by it or by Domtar, contending that because the MCA Agreement is void, Williams Land did not receive reasonably equivalent value for the payments. Apex, on the other hand, contends that the claim fails as a matter of law because no interest of the debtor was transferred: because the MCA Agreement is a sale and not a loan, Williams Land did not have an interest in the funds paid to Apex.

The court turns first to Apex's argument. Because the court has found as a matter of law that the MCA Agreement is a loan, Williams Land did have an interest in the funds transferred both by Williams Land and by Domtar, and Apex's "no transferred interest" argument in defense of the § 548 claim necessarily fails.

However, although the court has also found the MCA Agreement to be void under New York law, this determination alone does not answer the question of whether reasonably equivalent value was received by Williams Land for the payments it or Domtar made to Apex. Reasonably

---

[7] The claims are discussed in a different sequence than how they are set forth in the Amended Complaint.

equivalent value is based on the actual value given and received, not necessarily the value(s) contemplated by the contract. There is no dispute that Apex did advance funds in the amount of $245,000 to Williams Land, and that advance constitutes value. It is also undisputed that the payments made by or on behalf of Williams Land *to* Apex total less than the $245,000 advanced to Williams Land *by* Apex.[8] Accordingly, the court concludes as a matter of law that Williams Land did receive reasonably equivalent value for the funds transferred by or on behalf of Williams Land. Apex's motion for summary judgment on this claim will be ALLOWED.

### Fifth and Sixth Claims for Relief: Avoidance of Preference under 11 U.S.C. § 547 and Recovery of Avoided Transfers under 11 U.S.C. § 550

Pursuant to § 547 of the Bankruptcy Code, a debtor in possession may avoid a transfer made within 90 days of the petition date on account of an antecedent debt that enables a creditor to receive more than it would have received in a chapter 7 case had the transfer not been made. It is undisputed that on or about July 14, 2022, within the 90 days preceding the filing of Williams Land's bankruptcy petition, Apex received the amount of $30,159.42 from Domtar to be applied to the Williams Land obligation. Based on its assertion that the MCA Agreement is a true sale, Apex disputes both that the funds were property of Williams Land and that there was an antecedent debt.

The court has concluded that the MCA Agreement was a loan and not a sale, effectively determining the elements of antecedent debt and transfer of an interest of the debtor in property as a matter of law. Because Apex is under or unsecured, that payment allowed Apex to receive more than it would have received in a chapter 7 liquidation. Consequently, the elements of a preference

---

[8] The court expresses no opinion on whether a finding of criminal usury as a defense to a proof of claim also may be used as part of an affirmative § 548 claim to establish lack of reasonably equivalent value where the debtor has paid to the MCA entity more than the funds advanced, as those are not the facts before the court.

have been established through the undisputed facts and this court's prior conclusions of law, and summary judgment is appropriate unless a defense under § 547(c) applies.

As noted above, Williams Land and Apex entered a Stipulation of Settlement on July 11, 2022, which contemplated a payment of $30,000 to be made to Apex "on behalf of" Williams Land. Summary Judgment Ex. 5, D.E. 97-1 at 44. There is no dispute that the $30,159.42 payment made by Domtar to Apex is the payment contemplated in the Stipulation of Settlement. Apex contends that because the parties agreed this payment would be made, their agreement is sufficient to characterize the payment as having been made in the ordinary course of business under § 547(c)(2).

To establish ordinary course for purposes of § 547(c)(2), Apex is required to show that the transfer was "made in the ordinary course of business or financial affairs of the debtor and the transferee; or made according to ordinary business terms." 11 U.S.C. § 547(c)(2). The record before the court shows that the ordinary course of business between Williams Land and Apex consisted of weekly payments in the amount of $18,750.[9] In light of that established pattern, the payment of $30,159.42 was a unique, one-time event made after collection litigation was pursued, the parties reached a settlement, and Apex sent a UCC demand letter to Domtar. This was well outside the ordinary course of dealings between Williams Land and Apex. In addition, there is nothing before the court to establish that this payment could fall within ordinary business terms in the industry.

Because there are no material issues of disputed fact, the court concludes as a matter of law that the transfer made by Domtar on July 11, 2022 in the amount of $30,159.42 is avoidable under

---

[9] The court expresses no opinion of whether a similarly-situated creditor would prevail on an ordinary course defense for payments made under similar contract terms within the 90 days prior to filing; the court notes simply that the Domtar payment here was not consistent with the established pattern of payments between these parties.

§ 547. The motion for summary judgment by Apex on this claim will be DENIED, and summary judgment will be entered in favor of Williams Land. Similarly, Williams Land is entitled to recover the avoided transfer in the amount of $30,159.42 for the benefit of the estate pursuant to § 550. The motion for summary judgment by Apex on the § 550 claim will be DENIED, and summary judgment will be entered in favor of Williams Land.

**Fourth Claim for Relief: Unfair and Deceptive Trade Practices**

The Amended Complaint asserts that Apex holds itself out as an alternative funding source that personalizes solutions to a specific business's individual needs, preying on small, insolvent businesses and issuing disguised loans that are criminally usurious. D.E. 14 at 10-11, ¶¶ 78-82. The Amended Complaint also asserts that Apex's lending practices were unethical and predatory, and further that Apex falsely recorded payments made on or behalf of Williams Land, artificially inflating the amount still owed by Williams Land and asserted in the proof of claim. *Id.* at 11, ¶¶ 88-90. Williams Land contends that these are unfair and deceptive acts in or affecting commerce that entitle it to treble damages and attorney's fees[10] under chapter 75 of the North Carolina General Statutes, the Unfair or Deceptive Trade Practices Act (UDTPA). That act prohibits "unfair or deceptive acts or practices in or affecting commerce," N.C. Gen. Stat. § 75-1.1(a), with

---

[10] § 75-16.  Civil action by person injured; treble damages. If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.

§ 75-16.1.  Attorney fee. In any suit instituted by a person who alleges that the defendant violated G.S. 75-1.1, the presiding judge may, in his discretion, allow a reasonable attorney fee to the duly licensed attorney representing the prevailing party, such attorney fee to be taxed as a part of the court costs and payable by the losing party, upon a finding by the presiding judge that: (1) The party charged with the violation has willfully engaged in the act or practice, and there was an unwarranted refusal by such party to fully resolve the matter which constitutes the basis of such suit; or (2) The party instituting the action knew, or should have known, the action was frivolous and malicious.

"commerce" defined to include "all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b). Case law informs that the factfinder (typically a jury) finds the "facts," then the court decides as a matter of law whether the facts found by the jury satisfy the conduct standard under the statute. *See, e.g.*, *Hardy v. Toler*, 288 N.C. 303, 310 (1975) (establishing these roles for the jury and for the court in § 75-1.1 cases). In the summary judgment context, the court must consider whether the undisputed facts constitute unfair or deceptive acts in or affecting commerce.

In its motion for summary judgment, Apex makes two legal arguments. The first is that the filing of an allegedly incorrect proof of claim is not an act in or affecting commerce, rendering the UDTPA inapplicable. Apex is correct that the act of filing a proof of claim is not "in or affecting commerce." *Winter v. Suddenlink (In re Winter)*, Adv. Pro. No. 15-00013-5-DMW, 2015 Bankr. LEXIS 2839, at *8–9 (Bankr. E.D.N.C. Aug. 26, 2015). Accordingly, the court determines as a matter of law that Williams Land cannot prevail on its UDTPA claim for the "act" of filing an inaccurate proof of claim. However, the allegation that the proof of claim itself is unfair or deceptive is only one of the bases on which Williams Land seeks to recover under the UDTPA, so this holding does not resolve the entire claim for relief.

Apex's second legal argument is that any claim related to the terms of the MCA Agreement was released in the Stipulation of Settlement. The court previously considered and rejected this contention. In its order denying the motion to dismiss the amended complaint, the court noted that

> under New York law as cited by WLC, a 'settlement agreement purporting to compromise and release a borrower's usury claim is void and unenforceable if the original usurious obligation transcends into the parties' subsequent agreement. *Adar Bays, LLC v. 5Barz Int'l, Inc.*, 2018 U.S. Dist. LEXIS 139843, at *16 (S.D.N.Y. August 16, 2018) (citation omitted). Accordingly, the claim objection and other claims based on the allegation of usury have not been waived.

D.E. 62 at 15-16. The Stipulation of Settlement provided a compromised repayment schedule for Williams Land to satisfy the obligation established through the MCA Agreement, and thus the original usurious obligation transcended into the Stipulation of Settlement. The crux of the UDTPA claim is that the MCA Agreement was marketed as an individualized solution to Williams Land's financing needs, purported to be a sale, and was, in fact, a usurious loan. Thus, the UDTPA claim is largely based on the allegation of usury, and the court concludes that the UDTPA claim was not released by the Stipulation of Settlement.

On substantive review of that claim, Apex did not present the court with a threshold demonstration that there is no genuine issue of material fact on this claim sufficient to shift the burden to Williams Land. Instead, the only "facts" provided by Apex are a self-serving statement that it does not prey on small and insolvent businesses, Decl. of Apex Funding Source, LLC, Summary Judgment Ex. 8, D.E. 97-2 at ¶ 6, and its Declaration and discovery responses that address the alleged failure to properly apply all payments received from Domtar to the Williams Land account. *See, e.g.* Decl. of Apex Funding Source, LLC, Summary Judgment Ex. 8, D.E. 97-2 at ¶¶ 66, 67, 71, 73; Apex Response to CFI's Interrogatories, Summary Judgment Ex. 10, D.E. 97-4 at 14-15, Int. No. 7. There is no evidence in the record (undisputed or otherwise) as to how Williams Land came to enter the MCA Agreement with Apex or what representations were made and by whom at the time the agreement was entered, other than the representations contained in the agreement itself.

Accordingly, the court finds that Williams Land cannot prevail on its UDTPA claim for the "act" of filing an inaccurate proof of claim and Apex's motion summary judgment will be ALLOWED IN PART. With respect to all other allegations of unfair or deceptive acts or practices, Apex has failed to demonstrate that there are no issues of material fact that would require judgment

24

in its favor as a matter of law on the UDTPA claim, and Apex's motion for summary judgment is therefore DENIED IN PART.[11]

### Second Claim for Relief: Objection to Claim

Apex moved for summary judgment on all claims in the Amended Complaint, but the motion does not specifically address the objection to claim other than to the extent that a finding in favor of Apex with respect to the characterization of the MCA Agreement would necessarily require a finding in its favor on the objection to claim. Based on the court's conclusion that the MCA Agreement is void as criminally usurious as well as its conclusion that Apex received an avoidable preference, the final amount of Apex's claim in the case will have to be determined at trial. Accordingly, Apex's motion for summary judgment on the objection to claim is DENIED.

### Third Claim for Relief: Equitable Subordination

Just as the motion for summary judgment does not specifically address the objection to claim, it does not specifically address the claim for equitable subordination. Accordingly, the court finds that Apex has not shown that there are no disputed issues of material fact, and summary judgment is DENIED.

### MOTIONS FOR SUMMARY JUDGMENT ON CFI'S CLAIMS IN THE INTERVENOR COMPLAINT

### CFI's Claim for Declaratory Judgment that Transfers Recovered by Williams Land Remain Subject to CFI's Lien

CFI's Intervenor Complaint and brief in support of summary judgment sought a declaratory judgment that, because it held a senior lien on the funds transferred to Apex, any payments avoided by Williams Land remain subject to its lien and should be avoided for its benefit, not the benefit of the estate. Specifically, CFI maintained in its Intervenor Complaint and in its brief that Williams

---

[11] It is not clear to the court what damages may have been suffered by Williams Land as a result of the asserted unfair or deceptive acts; however, the court acknowledges that the measure of damages may differ from the evaluation of reasonably equivalent value for purposes of the § 548 claim.

Land transferred property that was subject to CFI's properly-perfected security interest, and that because avoidance of the transfers does not operate to remove a properly perfected lien in the transferred funds, the funds remained subject to CFI's lien. *See* D.E. 92 at 12-13. Therefore, CFI maintained, its rights to the transferred funds are senior to the rights of Williams Land. *Id.*

At the hearing, CFI conceded that it did not have a perfected lien on the *proceeds* of accounts receivable; put another way, it did not have a lien on funds once an account was collected and in the hands of Williams Land. This would include any funds paid directly to Apex by Williams Land as well as the funds paid by Domtar to Apex. Thus, CFI concedes that it has no lien on any funds Williams Land might recover under the debtor's chapter 5 avoidance powers. Because the court has already concluded that Apex is entitled to summary judgment on the fraudulent transfer claims, there will be no recovery by Williams Land of any funds transferred directly by Williams Land to Apex, rendering this argument largely academic unless CFI has any claim to the proceeds of Williams Land's avoided preference.

It is generally understood that recoveries of a postpetition avoidance action constitute postpetition property of the estate and are not subject to prepetition liens, "even if the recovered funds are traceable to prepetition collateral and the creditors would have an independent right of recovery against the avoidance defendants." *Hutson v. First-Citizens Bank & Tr. Co. (In re Nat'l Gas Distribs., LLC)*, Nos. 06-00166-8-ATS, S-06-00031-8-AP, 2007 Bankr. LEXIS 4703, at *22 (Bankr. E.D.N.C. July 24, 2007); *see also* 5 Collier on Bankruptcy P 552.02 (16th 2025) ("On the whole, therefore, the more persuasively reasoned opinions do not permit secured creditors to share in recoveries obtained by bankruptcy trustees or estate representatives pursuant to the avoiding powers, even where such creditors may have independent, traceable rights to those funds."). CFI

conceded this at the hearing and stated that it does not contend it has a lien on any avoidance recovery.

Instead, CFI revised its argument to contend that its entitlement to the proceeds of this litigation is limited to the payments received by Apex from Domtar – a right that arises because "as soon as that receivable was paid out by Domtar to Apex, it gave [CFI] a cognizable cause of action against Apex for conversion." March 18, 2025 Hearing audio at 42:40. At the same time, CFI argued that Apex could be subject to double liability: first to the debtor for avoided payments, and secondly to CFI for converted funds. From this, it appears to the court that CFI has recognized that it has no claim to any proceeds Williams Land may recover pursuant to Williams Land's avoidance actions. Instead, CFI simply has direct claims against Apex that involve the same sums and that may or may not be impacted by Williams Land's independent chapter 5 actions. Accordingly, the court denies CFI's motion for summary judgment on its declaratory judgment claim, and will enter summary judgment in favor of Williams Land on this claim.

### Cross-motions on CFI's Claim for Conversion

CFI contends that Apex converted CFI's collateral when Apex received funds from Domtar pursuant to the UCC letter Apex sent demanding that Domtar remit moneys owed to Williams Land to Apex. To be clear, CFI does not contend that it owned the Domtar receivable pursuant to its factoring arrangement, but only that it held a higher priority security interest in the Domtar receivable. Apex, on the other hand, maintains that CFI has not satisfied any of the required elements of conversion under New York law, all of which must be shown: specifically, CFI has not demonstrated that it had a present right to possession of the Domtar payments, that CFI made a demand for return of the collateral, that Apex had actual knowledge of CFI's interest, or that the

funds were designated for a specific purpose and used for an unauthorized purpose. *See* D.E. 101 at 7-10.

The parties agree that New York law governs this claim. *See* D.E. 92 at 6-8; D.E 101 at 5-6. Under New York law, conversion is "any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." *Meese v. Miller*, 436 N.Y.S.2d 496, 500 (4th Dep't 1981). New York courts have recognized a cognizable claim for conversion by a secured creditor against another secured creditor. *In re A.N. Frieda Diamonds, Inc.*, 616 B.R. 295, 317 (Bankr. S.D.N.Y. 2020), *aff'd*, 633 B.R. 190 (S.D.N.Y. 2021) ("The disposition by a junior creditor of collateral in which another creditor has a valid and perfected lien constitutes conversion of the senior creditor's interests in the collateral."); *HSCM Bermuda Fund Ltd. v. Newco Cap. Grp. VI LLC*, 619 F. Supp. 3d 434, 442 (S.D.N.Y. 2022) (plaintiffs plausibly stated a claim for conversion by alleging that defendant interfered with their property interest in borrower's assets by asking borrower's vendors to pay defendant in derogation of plaintiffs' rights); *Bank of India v. Weg & Myers, P.C.*, 257 A.D.2d 183, 185–86, 691 N.Y.S.2d 439 (N.Y. App. Div. 1999) (bank awarded summary judgment against law firm for conversion where proceeds of collateral insurance policy were applied to legal fees and paid to debtor despite knowledge of bank's interest in and entitlement to proceeds).

Apex contends that it had no knowledge of CFI's senior security interest, and CFI agrees that the undisputed facts demonstrate that Apex did not search the public record to discover CFI's perfected lien. However, Apex is deemed to have constructive knowledge of what is on the public record. *See A.N. Frieda Diamonds,* 616 B.R. at 310–13 (citing additional authorities). In *A.N. Frieda Diamonds*, the defendants maintained that they were not actually aware of the creditor

bank's perfected security interests; the court acknowledged this, but held that "even if that had been the case it was only because, by their own admission, they never bothered to check to see if a UCC financing statement was on file. … [T]he filed financing statement is deemed under New York law to constitute valid notice to other creditors." *Id.* at 313. "'Notice filings' would be meaningless if a creditor . . . could defeat the perfected rights of a senior creditor just by refusing to investigate and thereby deliberately avoiding actual knowledge of a senior secured claim that is readily ascertainable." *Id.* at 314. The same is true here.

Having found that Apex took possession of the Domtar payments with constructive knowledge of CFI's senior lien on all accounts, the court turns to whether CFI had a present right to possession of the funds at issue. In the cases cited above in which a New York court found conversion of a senior lender's collateral by a junior lienholder, the court either noted as undisputed or found as a fact that the debtor was in default to the senior secured creditor, giving that creditor a right to possession of the collateral. In this case, there is no evidence that CFI had declared a default, and CFI admitted at the hearing that it had taken no action to assert its right to the accounts. Accordingly, there is no evidence that CFI had a present right to possession of the Domtar accounts at the time that those funds were paid to Apex.

It is also undisputed that CFI made no demand for return of the collateral. Where the original possession of another's property is lawful, "a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property." *Schwartz v. Cap. Liquidators, Inc.*, 984 F.2d 53, 54 (2d Cir. 1993) (quoting *Johnson v. Gumer*, 94 A.D.2d 955, 464 N.Y.S.2d 318, 319 (4th Dep't 1983)); *see also Schloss v. Danka Bus. Sys. PLC*, No. 99 CIV. 0817 (DC), 2000 WL 282791, at *7 (S.D.N.Y. Mar. 16, 2000), *aff'd*, 234 F.3d 1263 (2d Cir. 2000). There is nothing inherently unlawful about a junior lienholder taking possession of

its collateral; a junior lienholder would simply do so subject to a senior lienholder's rights. For conversion to occur where possession is lawful, Apex either had to refuse to return the funds after demand by CFI for those funds, or dispose of the funds without notice to CFI. CFI presented no evidence to establish that demand was made, and slim argument that this element is not required. Indeed, the cases cited above for the proposition that the senior lender had to have declared a default also included a clear demand and refusal to return the collateral or, in the case of *A.N. Frieda Diamonds*, disposal of the tangible collateral.

Finally, to establish a claim for conversion where the property in question is money, the funds must have designated for a specific purpose and used for an unauthorized purpose. In *Manufacturers Hanover Tr. Co. v. Chem. Bank*, 160 A.D.2d 113, 559 N.Y.S.2d 704 (1990), the plaintiff wired funds to the defendant to be credited to a specific account; when the defendant applied the funds to a different account and refused a demand for their return, it was liable for conversion. "An action will lie for the conversion of money where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." *Id.* at 113; *see also E. Schodack Fire Co. v. Milkewicz*, 140 A.D.3d 1255, 1256, 34 N.Y.S.3d 640 (2016) (holding that "[w]here the property alleged to have been converted is money, 'it must be specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner'") (quoting *Salatino v. Salatino*, 64 A.D.3d 923, 925, 881 N.Y.S.2d 721 (2009) (internal quotation marks omitted)). Here, there is no evidence that the Domtar funds were designated for a specific purpose and used for an unauthorized purpose. The Domtar account had not been purchased by CFI, it was simply one of many accounts on which CFI held a lien that otherwise was used for operation of Williams Land's business. CFI admitted at the hearing that if Domtar had paid Williams Land on its account and then Williams Land, in turn, paid Apex, CFI

would have no claim against Apex. It is difficult to see how CFI should be in a *better* position as a result of the direct payment from Domtar to Apex than it would have been in had Domtar paid Williams Land first.

In sum, the court finds that CFI did not establish the elements of conversion for either of the payments from Domtar to Apex[12] because, even with Apex's deemed constructive knowledge of CFI's superior lien, CFI failed to establish three elements of a conversion claim: that CFI had a right to possession, that the funds were designated for a specific purpose and used for an unauthorized purpose, and that CFI made a demand to Apex for the return of the funds. Accordingly, Apex's motion for summary judgment on CFI's claim for conversion is ALLOWED, and CFI's motion for summary judgment is DENIED.

### CFI's Claim for Tortious Interference

In its brief and at the hearing, CFI conceded that it does not have evidence to support its claim for tortious interference. Accordingly, and as announced at the hearing, summary judgment will be entered in favor of Apex on the tortious interference claim.

### MR. KLEIN'S MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS

Finally, and as noted above, at the hearing, Williams Land and CFI conceded that there is no evidentiary support for any of the claims asserted against Mr. Klein in the Williams Land Amended Complaint or in the Intervenor Complaint. Accordingly, summary judgment will be entered in favor of Mr. Klein on all claims.

---

[12] Because the court finds that CFI has not established a claim for conversion for either payment, it need not consider whether the payment avoided by Williams Land as a preference could also be subject to a claim for conversion. The court has serious concerns about the viability of that claim as intruding on the rights conferred on a debtor in possession by the Bankruptcy Code, as well as subjecting a creditor to refunding the same sums twice with the ability to amend its claim to seek payment through the bankruptcy process only for the avoided preference payment. Indeed, the court has concerns about a secured creditor using a state law claim for conversion to assert rights to funds that the Bankruptcy Code allows a debtor to recover for the benefit of all creditors. But, that issue does not have to be resolved by the court today.

**CONCLUSION**

Based on the foregoing,

Mr. Klein's motions for summary judgment on all claims in the Amended Complaint and the Intervenor Complaint are ALLOWED and Mr. Klein is dismissed as a party to this proceeding;

Apex's motion for summary judgment on Williams Land's first claim for relief, avoidance of fraudulent transfers pursuant to 11 U.S.C. § 548, is ALLOWED;

Apex's motion for summary judgment on Williams Land's second claim for relief, objection to claim, is DENIED;

Apex's motion for summary judgment on Williams Land's fourth claim for relief, unfair and deceptive trade practices pursuant to chapter 75 of the North Carolina General Statutes, is DENIED IN PART and ALLOWED IN PART;

Apex's motion for summary judgment on Williams Land's fifth claim for relief, avoidance of preferential payments in the amount of $30,159.42 pursuant to 11 U.S.C. § 547, is DENIED and summary judgment will be entered in favor of Williams Land on this claim;

Apex's motion for summary judgment on Williams Land's sixth claim for relief, recovery of avoided transfers pursuant to 11 U.S.C. § 550, is DENIED and summary judgment will be entered in favor of Williams Land on this claim in the amount of $30,159.42;

Apex's motion for summary judgment on Williams Land's third claim for relief, equitable subordination, is DENIED;

CFI's motion for summary judgment on its claim for declaratory judgment is DENIED, and summary judgment will be entered in favor of Williams Land on this claim;

CFI's motion for summary judgment on its claim for conversion against Apex is DENIED, and Apex's motion for summary judgment on CFI's claim for conversion against it is ALLOWED; and

Apex's motion for summary judgment on CFI's claim for tortious interference with contract is ALLOWED.

The remaining issues, including Williams Land's objection to Apex's claim in the chapter 11 case,

Williams Land's claim for unfair or deceptive trade practices, and Williams Land's claim for

equitable subordination, will be set for trial. Appropriate judgments will be entered at the conclusion of all matters before the court.

**END OF DOCUMENT**